UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KIMMY M. RAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:20-CV-601-SPM |
| | ) |
| KILOLO KIJAKAZI, | ) |
| Acting Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security (the "Commissioner") denying the application of Plaintiff Kimmy M. Ray ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act"). The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 5). Because I find the decision denying benefits was not supported by substantial evidence, I will reverse the Commissioner's decision and remand the case for further proceedings.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

I.     STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Hum. Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). Under the Social Security Act, a person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). *Accord Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] would be hired if he [or she] applied for work." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment that meets the [twelve-month duration requirement in § 404.1509 or § 416.909], or a combination of impairments that is severe and meets the duration requirement"; if the claimant does not have a severe impairment, the claimant is not disabled. 20

C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(ii); *McCoy*, 648 F.3d at 611. To be severe, an impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner assesses the claimant's residual functional capacity ("RFC"), 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), which "the most [a claimant] can do despite [his or her] limitations," 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). *See also Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). At Step Four, the Commissioner determines whether the claimant can return to his or her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his or her past relevant work, the claimant is not disabled; if the claimant cannot, the analysis proceeds to the next step. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c)(2), 416.920(a)(4)(v), 416.920(g), 416.1560(c)(2); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he or she is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2).

## II.   PROCEDURAL BACKGROUND

In 2014, Plaintiff applied for DIB and SSI, alleging that she had been unable to work since March 19, 2014. (Tr. 196-208). Her application was denied initially. (Tr. 133-34). On November 5, 2014, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ) (Tr. 144, 146). On September 13, 2016, the ALJ held a hearing. (Tr. 38-71). On January 12, 2017, the ALJ issued an unfavorable decision. At Step One, the ALJ found that Plaintiff has not engaged in substantial gainful activity since the alleged onset date. At Step Two, the ALJ found that Plaintiff had the severe impairments of minimal degenerative changes of the lumbar spine with lumbago, borderline intellectual functioning, depression, generalized anxiety disorder, and post-traumatic stress disorder. At Step Three, Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 21-22). The ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that she must never climb ladders, ropes, or scaffolds and is capable of performing simple, one-to-two-step tasks in an environment where there are only occasional work place changes and where contact with supervisors, co-workers or the general public is occasional. (Tr. 23). At Step Four, the ALJ found Plaintiff unable to perform any past relevant work. (Tr. 31). At Step Five, relying on the testimony of a vocational expert, the ALJ found Plaintiff capable of performing other jobs existing in significant numbers in

the national economy. Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. 33). On November 6, 2017, the Appeals Council denied plaintiff's request for review. (Tr. 1-3).

Plaintiff sought judicial review of the 2017 ALJ decision, and this Court reversed the decision and remanded the case back to the Commissioner for further consideration. (Tr. 753-71). Specifically, the Court found that the ALJ's analysis of whether Plaintiff's impairments satisfied the requirements of Listing 12.05 (Intellectual Disability) was based on a legal error and contained ambiguities, and that in light of the evidence in the record as a whole regarding Plaintiff's IQ scores and other impairments, the Court could not determine whether the ALJ's determination that Plaintiff's impairments did not satisfy Listing 12.05 was supported by substantial evidence. (Tr. 770).

Following remand, on November 4, 2019, a second ALJ held a second hearing, at which Plaintiff, a medical expert, and a vocational expert testified. (Tr. 698-724). On February 7, 2020, the ALJ issued a second unfavorable decision. (Tr. 676-90). At Step One, the ALJ again found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 19, 2014. (Tr. 679). At Step Two, however, the ALJ found that although Plaintiff had several physical and mental medically determinable impairments (minimal degenerative disc disease of the lumbar spine, borderline intellectual functioning, depression, and generalized anxiety disorder), Plaintiff did not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months, and therefore did not have a severe impairment or combination of impairments. (Tr. 679). Accordingly, the ALJ terminated the analysis at Step Two and found that Plaintiff had not been under a disability, as defined in the Act, from March 19, 2014, through the

date of the decision. (Tr. 689). The decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

Plaintiff filed a subsequent claim for SSI, and she was found disabled as of November 17, 2017. (Tr. 676, 777).

### III. FACTUAL BACKGROUND[2]

At the hearings before the ALJs, and in her Function Report, Plaintiff stated that she has problems with memory, concentration, and understanding and forgets a lot of things (Tr. 261, 265, 717); that her hobbies are reading and watching television, but when reading she does not understand some words (Tr. 264); that she could not read the instructions on a box of macaroni and cheese and could not read a newspaper article (Tr. 55, 715); that she has visual and auditory hallucinations (Tr. 47-48, 53); that she gets angry and cries a lot (Tr. 57, 717); and that she does not drive because she has failed her driving test three times (Tr. 714). She has a case worker or social worker at the Independence Center who helps her by scheduling her appointments and by putting her medications into pill organizers. (Tr. 716-17). Plaintiff last worked in May of 2011, putting bottles on an assembly line. (Tr. 46). She has also worked doing child care in her home and in a day care. (Tr. 46, 62, 64-65).

Plaintiff's school records show that her IQ was recorded as 68 in 1971, as 66 (non-verbal) and 78 (verbal) in 1974, and as 71 in 1977. (Tr. 301). Plaintiff's high school records show that in ninth grade, she received five "F" grades, two "D" grades, and one "C" grade; in tenth grade, she received four "F" grades and two "W" grades (for "withdrawn"). She had a cumulative GPA of 0.200 by the second semester of her sophomore year. (Tr. 304, 306). There is no record of her

---

[2] Because Plaintiff's arguments are directed toward Plaintiff's mental impairments, the Court focuses primarily on evidence relevant to those impairments.

completing or passing any courses after ninth grade. Plaintiff testified at the first hearing that she finished the finished the eleventh grade, after being "put out of the school" for behavioral problems. (Tr. 46); she testified at the second hearing that she completed "the first part" of eleventh grade. (Tr. 711). She does not think she was in special education. (Tr. 46).

On September 29, 2014, Plaintiff underwent a consultative examination by licensed psychologist Sherman Sklar, M.E. Mr. Sklar noted that Plaintiff "appeare[ed] to have a low IQ." (Tr. 351). He noted that Plaintiff "spoke in an unclear manner and spoke rapidly, so it was a little difficult to understand her, but she was able to make herself understood." (Tr. 349). He reported that she cried at several points during the examination and related being called, "slow, dumb, and stupid." (Tr. 349). Her chief complaints were depression and hearing voices. (Tr. 349). There were no signs of a thought disorder in terms of tangentiality, flight of ideas, or perseveration. (Tr. 351). Her responses to cognitive questions showed "some deficits in her social judgment, her calculation abilities and abstract reasoning abilities." There were no obvious deficits in her ability to focus. (Tr. 352). She was diagnosed with depressive disorder. Mr. Sklar assessed a Global Assessment of Functioning score of 50, indicating "serious symptoms" or "serious impairment in social, occupational, or school functioning."[3] Mr. Sklar found that Plaintiff was not capable at the time of managing her own funds. (Tr. 353).

---

[3] A Global Assessment of Functioning ("GAF") score is based on a "clinician's judgment of the individual's overall level of functioning." *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000). A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

On October 29, 2014, Sherry Bassi, Ph.D., reviewed the record and found that Plaintiff had moderate restrictions of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. (Tr. 112). She opined, *inter alia*, that Plaintiff had sustained concentration and persistence limitations; that she was moderately limited in the ability to maintain attention and concentration for extended periods; that she was moderately limited in the ability to interact with the general public; and that she was moderately limited in that ability to set realistic goals or make plans independently of others. (Tr. 115-16). However, she found that Plaintiff retained the capacity to perform simple work. (Tr. 116).

On February 24, 2015, Plaintiff saw Thomas Spencer, Psy.D., for a psychological evaluation. (Tr. 662-65). Plaintiff reported that she had been an average student, denied habitual trouble at school, and stated that she planned to enroll in GED classes. (Tr. 663). Her speech was within normal limits, her insight/judgment seemed intact, and her affect was neutral. (Tr. 664). In a test of recent recall, she was able to recall zero out of three objects. (Tr. 664). In tests of attention and concentration and fund of information, she had some deficiencies. (Tr. 664-65). Dr. Spencer diagnosed generalized anxiety disorder and depressive disorder. He stated that it was his opinion that Plaintiff had "a mental illness that appears to interfere with her present ability to engage in employment suitable for her age, training, experience, and/or education" and that "the duration of the disability could exceed 12 months, but with appropriate treatment and compliance, prognosis improves." He assigned a GAF score of 55-60, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning. (Tr. 665).

On September 2, 2015, Plaintiff saw Surendra Chaganti, M.D., for a psychiatric examination and treatment. Plaintiff reported depression, anxiety, and feeling helpless and

8

hopeless. She also stated, "I forget things and don't understand well." In a mental status examination, Plaintiff was noted to be cooperative but anxious and fearful; her mood was anxious and depressed; her speech was clear but slurred at times; her affect was anxious and tearful; she had auditory and visual hallucinations; she had paranoid delusions; she had decreased energy and appetite; she had a sequential flow of thought; she had limited attention span and concentration; and her remote memory was intact, but her recent memory was not. She was noted to have "borderline intellect, as evidenced by [illegible]." Dr. Chaganti diagnosed her with major depressive disorder and borderline intellect. (Tr. 646-47).

Plaintiff continued so see Dr. Chaganti approximately once a month for about a year. At those visits, her behavior was consistently cooperative, and her thought processes were consistently logical. However, she was always noted to have limited attention span and concentration, difficulties with recent memory, and guarded insight/judgment. In addition, her mood was nearly always depressed and/or anxious; her affect was usually anxious; she usually had "poverty of speech"; and her intellect was usually described as "borderline." These records also contain several handwritten notes that are largely illegible. (Tr. 648-58)

On December 9, 2016, Plaintiff underwent a psychological evaluation by Dr. Alan J. Politte. Dr. Politte noted that Plaintiff had an agreeable attitude, a dull facial expression, and poor eye contact. (Tr. 669). He noted that her responses, although difficult to hear and understand, were coherent, relevant, and logical, and that she stayed focused on the questions given to her. (Tr. 669). Dr. Politte administered the Weschler Adult Intelligence Scale IV (WAIS-IV), the Comprehensive Trail-Making Test, and the Weschler Memory Scale IV. Her verbal comprehension score was 63, her perceptual reasoning score was 60, her working memory score was 63, her processing speed was 65, and her full scale IQ was 57. Her percentile scores for the WAIS-IV were in the 1st

9

percentile or below. She was noted to be "functioning at the low end of the mild mental retardation range." On the comprehensive trail-making test, her scores ranged from severely impaired to average, and her composite score indicated that she was moderately impaired. On the memory scale test, she scored "extremely low" in every area tested (auditory memory, visual memory, visual working memory, immediate memory, and delayed memory). (Tr. 669-72).

Records from 2017 and much of 2018 relate principally to Plaintiff's physical impairments, and those records contain no indication of intellectual or other mental impairments. In late 2018, Plaintiff again sought mental health treatment and was diagnosed with major depressive disorder. (Tr. 1597-98). She continued to seek treatment through at least August 2019, and her mental status examinations were highly variable; however, she was consistently noted to have poor insight and judgment and was often noted to have a limited fund of knowledge. (Tr. 1603-04, 1611, 1618, 1625, 1632-33, 1640, 1647). A nurse practitioner noted at one visit that she had a "likely intellectual disability" and was "in need of closer Rx supervision." (Tr. 1607).

On November 4, 2019, Colette Valette, Ph.D., a clinical psychologist, offered the following testimony at the hearing before the second ALJ. Dr. Valette noted that the record contained a diagnosis of major depression, a diagnosis of generalized anxiety disorder (which Dr. Valette put no support on because it was from a nontreating examiner), and a diagnosis of borderline intellectual functioning. (Tr. 702-03). With regard to borderline intellectual functioning, Dr. Valette stated that "there was no detail as to how that psychiatrist arrived at borderline intellectual functioning" and that in one or more other records it was estimated that Plaintiff had average or low-average intelligence. (Tr. 702-03). She also noted that Plaintiff did not have a history of special education classes, and that Plaintiff was never described by her medical doctors as being

intellectually slow or needing repetition. Thus, Dr. Valette stated, "I see no support for 12.11."[4] She thus evaluated Plaintiff under Listing 12.04, which includes depressive disorder. (Tr. 703). Addressing that listing, she found Plaintiff had no problems with understanding, remembering, and applying information; stating that she was always described with normal thought processes and thought content. (Tr. 703-04). She found Plaintiff had no problems interacting with others, because she was always described as calm and cooperative and her mood and affect were usually normal and only "very, very rarely is she described as observed to be depressed." (Tr. 703-04). Dr. Valette found that Plaintiff had no problems with concentration, persistence, or pace, because "her attention span is always described as normal." (Tr. 704). She found Plaintiff had mild problems with adapting herself or managing herself, based on an April 18, 2019 assessment mentioning alcohol and drug use. (Tr. 704).

With regard to Dr. Politte's IQ testing showing that Plaintiff was in the mild mental retardation range, Dr. Valette noted that Dr. Politte had not provided an interpretation of the results or a diagnosis, that the evaluation was not up to standard, and that she did not think Dr. Politte was truly qualified to be doing those tests. (Tr. 706). Dr. Valette also wondered about Plaintiff's effort in that IQ test (Tr. 705). She stated that Plaintiff was clearly not in the mild mental retardation IQ range, because a person with mild mental retardation would not have gone through 11th grade, and

---

[4] Plaintiff argues that Dr. Valette incorrectly identified the intellectual disability listing as 12.11 instead of 12.05. But because Dr. Valette was discussing the diagnosis of borderline intellectual functioning, it appears to the Court that she was reasonably referring to Listing 12.11, the listing under which borderline intellectual functioning is considered. *See Cronin v. Saul*, 945 F.3d 1062, 1068 (8th Cir. 2019) ("[S]ince Dr. Hobby diagnosed Cronin with borderline intellectual functioning, the ALJ properly considered listing 12.11 in assessing Cronin's case."); 20 C.F.R. § 404, Subpt. P, App. 1 ("Examples of disorders . . . evaluate[d] in this category [12.11] include . . . borderline intellectual functioning . . . .").

because such a person would have been described as having limited cognition in her medical records and would usually have someone with her to be the historian. (Tr. 706-07). She also stated that if Plaintiff had borderline intellectual functioning, she would be described in the medical records as intellectually slow, socially naïve, and immature, and would most likely need directions repeated several times. (Tr. 707). With regard to Dr. Politte's memory testing, she stated that "when memory is mentioned, it's never impaired." (Tr. 705).

## IV.     STANDARD FOR JUDICIAL REVIEW

The decision of the Commissioner must be affirmed if it "complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 58 F.3d 979, 981 (8th Cir. 2008)); *see also* 42 U.S.C. §§ 405(g); 1383(c)(3). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Pate-Fires*, 564 F.3d at 942 (quotation marks omitted). *See also Biestek*, 139 S. Ct. at 1154 ("Substantial evidence . . . means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Consol. Edison*, 305 U.S. at 229).

In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012). However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations

regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

## V.     DISCUSSION

Plaintiff challenges the ALJ's decision on several grounds, arguing that the ALJ erred by improperly relying on the testimony of consulting psychologist Dr. Valette to find that Plaintiff had no severe impairments; that the ALJ should have further developed the record with regard to Plaintiff's IQ; that the ALJ erred in finding that Plaintiff had no severe impairments; that the ALJ erred by repeating the Step Three errors identified by the Court's prior order remanding the case; and that the ALJ erred by again failing to articulate how she considered significant evidence in the record.

The Court first considers the ALJ's finding that Plaintiff's medically determinable impairments of borderline intellectual functioning, depression, and generalized anxiety disorder were not "severe," and thus that the disability analysis could be terminated at Step Two. At Step Two, the ALJ must determine whether the claimant has "a severe medically determinable physical or mental impairment," or "a combination of impairments that is severe," that lasted or is expected to last for at least twelve months. *See* 20 C.F.R. §§ 404.1509, 416.909; 404.1520(a)(4)(ii); 416.920(a)(4)(ii). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). Basic work activities are "the abilities and

13

aptitudes necessary to do most jobs," including, among other things, understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1522(b), 416.922(b).

While the requirement of severity is "not a toothless standard," it is also not an "onerous requirement." *Kirby*, 500 F.3d at 707. Additionally, though it is Plaintiff's burden to prove the existence of severe impairments, "the burden of a claimant at this stage of the analysis is not great." *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Id.* (quoting *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir.1996)).

After careful review of the entire record, and being mindful of both the deference due to the ALJ and the relatively low bar for finding an impairment to be severe, the Court finds that the ALJ's determination that Plaintiff's medically determinable mental impairments were not severe was not supported by substantial evidence. Up until Dr. Valette testified at the 2019 hearing, every source who evaluated Plaintiff's mental impairments—including a treating psychiatrist, three consultative examiners, and one non-examining state agency psychologist—found that Plaintiff had significant mental abnormalities that would appear to impact one or more of the abilities and aptitudes necessary for simple work. Plaintiff's treating psychiatrist diagnosed Plaintiff with major depressive disorder and borderline intellect; consistently noted that she had limited attention span and concentration, consistently noted that she had difficulties with recent memory, consistently noted that she had guarded insight/judgment; usually noted that she had an anxious and/or depressed mood; and usually noted that she had poverty of speech. Examining psychologist Mr.

14

Sklar found that Plaintiff appeared to have a low IQ, spoke in an unclear manner, and had some deficits in her social judgment, her calculation abilities, and her abstract reasoning abilities. State agency psychologist Dr. Bassi found that Plaintiff has moderate limitations in several areas of mental functioning, including in activities of daily living; in maintaining social functioning; in maintaining concentration, persistence, or pace; in the ability to interact with the general public; and in the ability to set realistic goals or make plans independently of others. Examining psychologist Dr. Spencer found deficiencies in tests of memory and attention and concentration, and he found that Plaintiff had a mental illness that appears to interfere with her present ability to engage in employment suitable for her age, training, experience, and/or education. Psychologist Dr. Politte found her full-scale IQ to be in the mild mental retardation range and found her memory testing scores to be extremely low.

Additionally, nonmedical evidence supports a finding that Plaintiff would have significant limitations in the ability to perform basic work activities, including Plaintiff's testimony and reports regarding her forgetfulness, difficulty understanding written instructions, difficulty concentrating, and frequent crying; the fact that Plaintiff has a case worker at the Independence Center who helps her by scheduling appointments and filling her pill boxes; Plaintiff's childhood IQ scores, which ranged from 68 to 78; and Plaintiff's school records, which show that she failed most of her classes and had a cumulative GPA of 0.2.

Admittedly, the record may not show that Plaintiff is unable to perform *any* work, but it is difficult to reconcile the evidence of record with a finding at Step Two that Plaintiff has no more than "a slight abnormality that would not significantly limit [her] mental ability to do basic work activities" such as understanding, carrying out, and remembering simple instructions; use of

15

judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.

The principal evidence in support of a finding that Plaintiff's mental impairments are not severe is the testimony of Dr. Valette, the consulting psychologist who testified at the 2019 hearing. The ALJ gave that opinion "great evidentiary weight," noting that Dr. Valette was a medical expert who had reviewed the entire record and finding her testimony consistent with the record as a whole. (Tr. 683). Although "the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence," *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (quotation marks omitted), it was not inappropriate for the ALJ to consider Dr. Valette's opinion along with the rest of the evidence in the record. After review of Dr. Valette's testimony and the rest of the record, however, the Court does not find that Dr. Valette's opinion is sufficient to support a finding that Plaintiff has no severe impairments at all. Significantly, Dr. Valette appears to have misread some of the medical records in reaching her conclusions. Dr. Valette opined that Plaintiff had no problems with concentration, persistence, or pace, because "her attention span is always described as normal." (Tr. 704). But to the contrary, a review of the records shows that Plaintiff's treating psychiatrist always—over a period of about a year—described her attention and concentration as "limited." In addition, consultative examiner Dr. Spencer found deficiencies in Plaintiff's attention and concentration after performing testing. Dr. Valette also stated that "when memory is mentioned, it's never impaired." (Tr. 705). Again, to the contrary, Plaintiff's treating psychiatrist *always* found Plaintiff had impaired recent memory, and consulting examiner Dr. Spencer found deficiencies in recent memory in his testing. Dr. Valette also opined that Plaintiff had no problems interacting with others, reasoning in part that Plaintiff's mood and affect were usually normal and only "very, very rarely" depressed. But

Plaintiff's psychiatrist almost always noted an anxious and/or depressed mood, and the consultative examiner found her to be tearful.

These misstatements significantly undermine Dr. Valette's testimony. In addition, other statements by the ALJ suggest that the ALJ may not have considered some significant evidence of Plaintiff's mental impairments. For example, in discussing the treatment records from the treating psychiatrist, the ALJ characterizes Plaintiff's mental status examinations as "essentially normal" aside from findings of anxious mood and affect, citing some normal findings such as Plaintiff being cooperative and having appropriate grooming and hygiene. The ALJ does not, however, discuss the psychiatrist's consistent findings of impaired recent memory, consistent findings of limited attention and concentration, or frequent findings of "poverty of speech"—all of which are highly relevant to the question of whether Plaintiff's borderline intellectual functioning and depression cause significant impairments in Plaintiff's ability to perform basic work activities. (Tr. 687). The ALJ may not "pick and choose only evidence in the record buttressing his conclusion." *Taylor ex rel. McKinnies v. Barnhart*, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004).

In sum, given the fact that everyone who has treated or examined Plaintiff has found her to have significant mental impairments that amount to more than "slight abnormalities," and the fact that the one medical source who found to the contrary appears to have misread the record in several ways, the Court does not find substantial evidence to support the decision to terminate the analysis at Step Two. Plaintiff has met her burden for showing an impairment or combination of impairments that significantly limit her ability to perform basic mental work activities, and the analysis should proceed to the next step. Accordingly, the Court will remand this case for further proceedings consistent with this opinion. *See, e.g., Nicola v. Astrue,* 480 F.3d 885, 887 (8th Cir. 2007) (holding that the ALJ's failure to find mental impairment severe required remand). Because

remand is required, the Court need not reach Plaintiff's remaining arguments. However, the Court notes that the ALJ's analysis of whether Plaintiff has an impairment that meets or equals a listing must be consistent with this Court's prior Memorandum and Order.

VI. **CONCLUSION**

For the reasons set forth above, the Court finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **REVERSED** and that this case is **REMANDED** under 42 U.S.C. § 1383(c)(3) and Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of March, 2022.